UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MATTHEW BERNSTEIN., | : | CIVIL ACTION NO. |
| | : | 16cv1277 |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| INDIAN MOUNTAIN SCHOOL, INC., | : | |
| | : | |
| Defendant. | : | JULY 28, 2016 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Introduction

When Matthew Bernstein was 12 years old he was entrusted to the care,

custody and supervision of Indian Mountain School, a private boarding and day school

for grades kindergarten through nine, in Lakeville, Connecticut.  School officials

promised, and Matthew and his parents trusted, that the school would do everything in

its power to keep him safe from harm.  Indian Mountain School betrayed that trust.

Instead of entering a safe and secure community fostering the learning and growth of

school children, Matthew found himself for the next three years in an environment of

well-known, extreme, and accepted predatory sexual assaults and pedophilia inflicted

by adults on young vulnerable boys, including fellatio, anal rape, voyeurism, fondling,

and forced masturbation.  These horrifying acts and others were inflicted on school

property, during the school year, by or under the noses of the school's teachers and

administrators, including its Headmaster, its Assistant Headmaster, the school psychiatrist, the school nurse, multiple other members of the faculty and staff, and members of the board of trustees.  Matthew brings this Complaint to seek recompense for the sexual abuse and assaults and life-long suffering Indian Mountain School inflicted on him and to shine a light on these events so that The School and the wrongdoers may be held accountable, other victims may be helped, future abuse may be prevented, and justice may be done.

## I.  Jurisdiction and Venue

1.    Jurisdiction obtains pursuant to 28 U.S.C. § 1332(a).

2.    The plaintiff resides in and is a citizen of the State of New York.

3.    The defendant is a non-stock corporation formed pursuant to the laws of the State of Connecticut with its principal place of business in the State of Connecticut.

4.    The amount in controversy vastly exceeds the statutorily required $75,000.00, exclusive of interest and costs.

5.    Venue lies in this District pursuant to 28 U.S.C. § 1391(a) in that the defendant resides in this District and the events, acts and omissions giving rise to the plaintiff's claims occurred in this District.

6.    The defendant's acts and omissions alleged herein occurred while the plaintiff was a minor.  The defendant agreed in writing to toll the statute of limitations

contained in Connecticut General Statutes § 52-577d until July 31, 2016; accordingly, this Complaint is timely filed.   Tolling Agreement is attached hereto.

## II.      Parties

7.      Matthew Bernstein attended Indian Mountain School from September 1980 to June 1983, when he was 12-15 years old.

8.      Indian Mountain School, founded in 1922, is an exclusive private boarding and day school for boys and girls in kindergarten through ninth grade, in Lakeville, Connecticut.


## III.     First Claim for Relief (Negligence):

9.      At the time of the sexual abuse and assaults described in this Complaint, Indian Mountain School charged thousands of dollars per year for the privilege of attending the school and residing on school grounds.

10.     In exchange for the substantial monetary compensation charged to Matthew's parents, and to the parents of the other minor children in the school's care and custody, Indian Mountain School assumed responsibility for, among other things, the students' protection, safety and wellbeing.

11.     The school promised Matthew and his parents that the health and welfare of the students was the school's highest priority.

12.     The school accepted the duty and responsibility to keep the children in its care and custody safe from harm.

13.     The school owed, and agreed that it owed, Matthew and the other minor children in its care and custody a duty to do everything within its power to protect them from sexual abuse by school administrators, faculty and staff.

14.     At the time of the sexual abuse and exploitation described in this Complaint, Connecticut law (Conn. Gen. Stat. Sec. 17-38a) required Indian Mountain School, the school's Headmaster and Assistant Headmaster, the school's teachers, its staff psychiatrist, and its registered nurse to report suspected child sexual abuse to state child welfare and law enforcement authorities.

15.     At the time of the sexual abuse and exploitation described in this Complaint, Connecticut law (Conn. Gen. Stat. Sec. 17-38b) required Indian Mountain School, the school's Headmaster and Assistant Headmaster, the school's teachers, its staff psychiatrist, and its registered nurse to immediately report to state child welfare authorities if they had reasonable cause to believe that one or more students were in danger of being sexually abused, even if they did not have reasonable cause to suspect that any such abuse had actually occurred.

16.     Notwithstanding these duties, responsibilities and promises, at the time Matthew entered and attended Indian Mountain School, the school's Headmaster and several of its teachers were pedophiles who preyed and had for years been preying on vulnerable children in the school's care.

4

17.    Notwithstanding the school's duties, responsibilities and promises, at the time Matthew entered and attended Indian Mountain School, the school, acting through its Board of Trustees, its officials and administrators, its faculty, its staff psychiatrist, and its registered nurse knew and should have known that the Headmaster and members of the faculty were pedophiles who preyed and had for years been preying on vulnerable children in the school's care.

18.    Notwithstanding the school's duties, responsibilities and promises, and the mandatory requirements of Connecticut law, before and at the time Matthew entered and attended Indian Mountain School, the school, acting through its Board of Trustees, its officials and administrators, its faculty, its staff psychiatrist, and its registered nurse, failed and refused to report suspected child sexual abuse at the school and the danger and threat of future child sexual abuse at the school to state child welfare and law enforcement authorities.

19.    Indian Mountain School English teacher Christopher Simonds sexually abused, assaulted, molested, exploited and threatened Matthew when Matthew was a vulnerable and defenseless boy at the school.

20.    Simonds had been a teacher at Indian Mountain School since approximately 1973; and during his approximately seven years at the school prior to the time that he molested and threatened Matthew, he manipulated, groomed, and sexually abused, assaulted, molested, fondled, sodomized and raped dozens of other school boys.

21.     As part of his manipulation and grooming of young boys during his years at the school prior to sexually assaulting, abusing and threatening Matthew, Simonds routinely showed pornographic pictures and films to the boys, and he gave them cigarettes, alcohol, and marijuana.

22.     Simonds also gave children at the school cocaine and LSD.

23.     Simonds took photographs of the boys while they were naked and involved in sex acts; and he used the photographs to blackmail the boys into gratifying his predatory and perverse sexual desires and into remaining silent about his continuing abuse.

24.     Headmaster Peter Carleton, Assistant Headmaster Steven Carver, multiple other faculty members and staff, and members of the Indian Mountain School Board of Trustees knew and should have known of Simonds' abusive and manipulative conduct and his frequent sexual abuse of the defenseless boys entrusted to the school's care.

25.     Carleton first learned of Simonds' pedophile tendencies and serial molestations from, among other sources, Steven Carver, a teacher and Assistant Headmaster of Indian Mountain School, Michele Nemiroff, a teacher at the school, and Bernice Harned, the school's registered nurse.

26.     Carver learned in or about the Spring of 1977 that Simonds possessed hard core child pornography, including 8 mm films, magazines, and photographs

depicting adults sexually assaulting and abusing pubescent and pre-pubescent boys and girls.

27.     According to Carver's sworn testimony, Simonds' pornography, some of which Carver had confiscated from the basement of Simonds' apartment on campus, consisted of "people engaging in oral, anal and vaginal intercourse.  There was a fair amount of heterosexual activity.  There was also quite a bit of homosexual activity, male with male, and a lot of it fairly young, you know, like, twelve to sixteen year old males."

28.     In sworn testimony, Carver later described the pornography, some of which showed adults forcing children to have sex with each other, as the "worst pornography" he'd ever seen.

29.     In or about the spring of 1977, Carver showed the child pornography to the school's staff psychiatrist, Charles S. Mirabile, Jr., and to the school's registered nurse, Bernice Harned.

30.     In sworn testimony, Nurse Harned later described some of Simonds' child pornography this way: "I remember they were pictures of what I would term Dutch children because of their specific haircuts.  And there were magazines.  And they were of girls and girls and boys and boys in homosexual and sexual acts. . . .  They were of naked children.  Younger children.  They were not adults. . . .  I would say, up to and including nine or ten years old."

7

31.     Nurse Harned testified: "I remember specifically that there was a label, I believe it was a mailing label, to Chris Simonds."

32.     Nurse Harned later testified under oath that, when she and Assistant Headmaster Carver showed Simonds' pornography to the school's staff psychiatrist, Dr. Mirabile, she told Mirabile that she "was concerned because Chris Simonds was always touching and hugging the students and especially those in his special photography group or club."

33.     It was well-known to Indian Mountain School administrators, faculty and staff, before and during Matthew's attendance at the school, that Simonds surrounded himself with a group of young male students known as "Simonds' boys" and "Simonds' pets".

34.     Many of these boys were members of Simonds' "print club".

35.     The "print club" met in a basement room, locked with a padlock to which only Simonds had a key, in one of the buildings on campus.

36.     Nurse Harned later testified under oath that she observed Simonds "touching the certain group of students more intimately than he did anyone else at the school," and the "group of students" was "his print club, his photography club."

37.     When Carver and Harned showed Simonds' pornography to Dr. Mirabile, Harned told Mirabile that Simonds "did touch and feel" his favored boys, and that Simonds "would allow them to come over to his home at odd hours."

38.     Around this same time, in or about the Spring of 1977, Harned told all of this same information about Simonds' child pornography and his predilection for the young boys in his "print club" and his inappropriate touching and feeling of the boys to the then outgoing Headmaster Dick Rouse, and to the Chairman of the Board of Trustees, William Cuddy.

39.     In or about the summer of 1977, Carver showed Simonds' hardcore child pornography to the school's incoming Headmaster, Peter Carleton; and Nurse Harned told Carleton all of the same concerns about Simonds' inappropriate touching and feeling of young boys that she had previously shared with Dick Rouse and William Cuddy.

40.     Each of these Indian Mountain School employees and officials knew that the child pornography belonged to Simonds.

41.     It was a crime under Connecticut law for Simonds to possess the child pornography.

42.     Each of these Indian Mountain School employees and officials were required by Connecticut law to immediately report Simonds' possession of the child pornography and his inappropriate behavior to state child welfare authorities.

43.     Also in or around 1977, Carver learned from a former Indian Mountain School student that Simonds was known to be sharing his hardcore pornography with students.

44.     School administrators and faculty knew and should have known that "Simonds' boys" were victims of Simonds' sexual abuse and exploitation.

45.     From 1977 onward, Assistant Headmaster Carver suspected that Simonds was a pedophile.

46.     Before and during Matthew Bernstein's attendance at the school, Carleton, Carver and other members of the school faculty and staff knew that Simonds frequented the boy's dormitory and individual boy's rooms after lights out.

47.     Before and during Matthew's attendance at the school, Carleton, Carver and other members of the school faculty and staff knew that Simonds invited boys to his apartment after lights out.

48.     On at least one occasion, upon learning that one of the boys was missing from his room late at night, Carleton and Carver went to Simonds's apartment searching for the boy.

49.     Simonds came to the door in his underwear and admitted that, in fact, the boy was in his apartment at that moment.

50.     Prior to Matthew's attendance at the school, school officials created a policy prohibiting faculty from visiting with boys after lights out.  The policy was created specifically to address Simonds's frequent visits to the boys' dorms and various boys' frequent visits to Simonds's apartment late at night.

51.     Notwithstanding the policy, Simonds continued to visit with boys in their rooms and in his apartment late at night.

52.     Notwithstanding the policy, Headmaster Peter Carleton also entered the boys' dormitories and individual boy's rooms late at night after lights out.

53.     Prior to Matthew's attendance at Indian Mountain School, Assistant Headmaster Carver concluded that Simonds was a danger to the students and that he should not be employed at the school.

54.     Among all of the other evidence of Simonds' pedophile tendencies and predatory yearnings, he posted sexually explicit and pornographic messages on the school's computer, where they were seen and read by school children.  Carver and Carleton knew about these messages.

55.     In or about 1984, Carleton learned that Simonds was actively preying on and sexually abusing boys at the school; but, other than discussing the charges with Simonds in the headmaster's office, Carleton took no meaningful action to protect the boys or to warn the boys or their parents, or to reach out to Simonds' previous victims.

56.     Despite knowing of Simonds' history of perverted, manipulative and sexually abusive and exploitive treatment of young boys, and despite knowing that the school housed and employed a sexual predator and pedophile, the Board, the Headmaster, the Assistant Headmaster, the school's staff psychiatrist, the school's registered nurse, and the school's lawyer allowed this sick and dangerous man to continue to have unfettered access to young vulnerable boys to satisfy his prurient sexual desires.

57.     Despite knowing that a teacher at the school with daily access to dozens of young boys was an active and prolific pedophile, and despite knowing that Simonds had sexually abused and was continuing to routinely sexually abuse vulnerable and defenseless boys in the school's custody, from 1977 to 1985 no meaningful steps were taken by anyone in a position of authority and responsibility at the school to warn the children and their parents, to protect the children, to fire or report or even discipline Simonds, or to do anything else in response to the certain knowledge that Simonds would strike again.

58.     The Indian Mountain School Board of Trustees met during the spring of 1985 to discuss Simonds' reported child sexual abuse.  In attendance at the meetings were Peter Carleton, Steven Carver, chairman of the Board Paul Levin, vice chairman John "Rusty" Chandler, Jr., John Virdon, Kathy Metz, Jerry Clooney, and former Board member and the school's then legal counsel William Cuddy.

59.     On the way to the meeting, in an effort to cover up his responsibility for exposing generations of Indian Mountain School students to a known child molester, Carleton told Carver not to mention to the Board members any of their prior conversations concerning Simonds' hard core child pornography, Simonds' late night rendezvous with young boys, or any of the other evidence of Simonds' twisted and dangerous propensities.

60.     In a similar effort to hide and escape responsibility for his own wrongdoing, Carver complied with Carleton's request.

61.     Not long after the Board meeting, in a May 24, 1985 letter to Carleton, Indian Mountain School psychiatrist Mirabile, wrote, in regards to students who might have been harmed by Simonds, "the very worst thing that could happen is that cause be given for someone to say that you or anyone else was trying to sweep something under the rug at the expense of the students."

62.     Even after the meeting in the spring of 1985 when the school's Board of Trustee's decided that Simonds' was a danger to the children and that his employment at the school must end, the school did not immediately admonish Simonds or even inform him of the Board's decision, the school allowed Simonds to continue to work at the school, the school allowed Simonds to have access to children for the remainder of the school year and afterwards; and the only safety precaution instituted by anyone was that Carleton and Carver took turns hiding in the woods outside Simonds' apartment between 10 p.m. and midnight for less than one week to see if any boys visited Simonds or if Simonds left the apartment to go to the boys' dormitories.

63.     After taking turns hiding in the woods for a few days, neither Carleton nor Carver did anything else to protect the defenseless boys in the school's care and custody.

64.     Not only did the school fail to take steps to help protect the children, but, according to a May 24, 1985 letter to Headmaster Carleton from school psychiatrist Dr. Mirabile, Carleton, incredibly, wanted to "discuss how best to help Chris [Simonds]."

65.     On May 24, 1985, Dr. Mirabile was informed by an attorney whom he had consulted that he had a legal "responsibility . . . to report acts of child abuse even where only reasonable suspicion exists."

66.     After being reminded of the requirements of Connecticut law, Mirabile explained to the lawyer that Carleton had assured him that such a report would be made.

67.     At the same time, Mirabile wrote to Carleton that he assumed Chairman of the Board William Cuddy "will make the same report as the law is apparently unequivocal".

68.     In fact, neither Dr. Mirabile, nor Headmaster Carleton, nor Attorney Cuddy, nor Assistant Headmaster Carver, nor Nurse Harned, nor anyone else at Indian Mountain School reported Simonds' actual or suspected sexual abuse of students at the school for approximately the next seven years.  In 1992, when the father of an abuse victim contacted the school and threatened to report the abuse himself to the authorities, the school finally followed the law.

69.     By that time, the criminal statute of limitations had passed, and neither Simonds nor anyone else at Indian Mountain School was ever arrested, prosecuted or convicted of their role in the abuse and neglect of children at the school.

70.     Mirabile's failure and refusal to follow the plain requirements of Connecticut's child sexual abuse reporting law was consistent with his cavalier and

14

unprofessional approach to the welfare of the Indian Mountain School students throughout his engagement as the school's staff psychiatrist.

71.     For example, in a September 15, 1978 letter to Headmaster Carleton, Mirabile wrote that, even when he provided so-called "therapy" to individual Indian Mountain School students, he was actually "overtly or covertly . . . serving a function that reflects the needs of the school as much as or more than the individual."

72.     As a result of the school's complete failure for many years to protect its young and vulnerable students from Simonds' predatory impulses and schemes, Simonds molested, threatened, exploited, and abused Matthew Bernstein on countless occasions while he was a student at the school.

73.     Simonds' abuse of Matthew began when Matthew was 12 years old, in seventh grade.

74.     Simonds invited and encouraged Matthew to visit him in his apartment on campus, where he allowed Matthew and other boys to smoke cigarettes and pot.

75.     For part of Matthew's eighth and ninth grade years, when he was 13-15 years old, he was assigned to live in Simonds' apartment.

76.     Simonds allowed and encouraged Matthew to smoke cigarettes and pot, to drink alcohol, to use LSD, and to buy and use cocaine and heroin.

77.     During Matthew's ninth grade year, Simonds drove him to New York City for the purpose of buying cocaine and heroin.

78.     Simonds used these illicit substances to groom Matthew and his other child victims, and to keep them silent.

79.     Near the end of his seventh grade year, Simonds began sexually assaulting, molesting, and exploiting Matthew, sometimes alone, sometimes with other boys.  Simonds continued this sexual abuse throughout Matthew's eighth and ninth grade years.

80.     Much of Simonds' abuse of Matthew and the other boys was inflicted in his (Simonds') apartment basement.

81.     Simonds' showed Matthew and the other children pornography films portraying adults having heterosexual and homosexual sex with each other and with children.

82.     Simonds forced Matthew and other boys to perform group masturbation on a graham cracker: Simonds forced the boy who ejaculated last to eat the cracker. During this unfathomable abuse, Simonds goaded the children, saying, "Who's gonna eat the ookie-cookie?"

83.     On other occasions, Simonds forced Matthew and other boys to sit in a circle and to masturbate the boy to their right, while Simonds watched and photographed the "game".

84.     When the boys ejaculated, the flash on Simonds' camera fired repeatedly.

85.     Simonds maintained a collection of 100's of photographs depicting Matthew and other naked and partially-dressed boys engaged in masturbation and other sex acts in various locations on the school campus, including Simonds' basement and living room.

86.     Simonds used these photographs as a form of blackmail to force the children to continue to gratify his violent and perverse desires and to keep silent about the abuse.

87.     Simonds plied Matthew and the other boys with drugs before showing them the kiddie porn films and requiring them to masturbate.

88.     Simonds forced Matthew and the other boys to masturbate themselves, to masturbate each other, and to masturbate him.

89.     Simonds sexually assaulted and abused Matthew in the basement, in a photography lab on campus, in Matthew's room in Simonds' apartment, and behind the curtain in the school theater.

90.     At an off-campus party during Matthew's ninth grade year, Simonds gave Matthew alcohol, pot and LSD, and forcibly performed oral sex on him.

91.     On one occasion, in his IMS apartment, Simonds anally raped Matthew.

92.     Two other times Simonds held Matthew down and ejaculated between his buttocks.

93.     When Simonds raped and molested Matthew, he smelled, sweated profusely, and wheezed.  His underwear was filthy, and he appeared not to have bathed.

94.     Three times a week on average during Matthew's eighth and ninth grade years when he lived in Simonds' apartment, Simonds forced him to engage in oral sex and mutual masturbation.

95.     Simonds was not the only adult at Indian Mountain School who enjoyed having sex with children.

96.     During Matthew's eighth or ninth grade year, French teacher Windsor Copeland kneeled down in front of Matthew, put his hands on Matthew's thighs, rubbed Matthew's penis through his pants, and tried to persuade Matthew to go to Copeland's house to have sex.

97.     In sworn testimony, Indian Mountain School Nurse Bernice Harned later testified that "Windsor Copeland had approximately the same relationship [as Chris Simonds] in touching and feeling and special times that students came . . . to his house."

98.     In or about the Spring of 1977, Nurse Harned told then Headmaster Dick Rouse of these precise concerns about Windsor Copeland.

99.     During Matthew's eighth or ninth grade year, Indian Mountain School headmaster Peter Carleton frequently visited the boys' showers, leered at Matthew and other boys, and commented on their penises and pubic hair.

100.   On one occasion at the headmaster's house, ostensibly to treat Matthew's jock itch, Carleton rubbed cream all over Matthew's penis, saying "You've got to cover every inch.  One day, I may have the same problem, and you may need to rub it on me."

101.   One night during Matthew's eighth or ninth grade years, while Simonds and his family were travelling and Matthew had to sleep in the dorm room of another student instead of Simonds' apartment, Carleton came into the room in the middle of the night, closed the door behind him, pulled up a chair next to the bed of the other boy sleeping in the room, and began running his hands through the boy's hair and stroking the boy's penis through the sheets.

102.   Matthew coughed, Carleton realized he was not alone with the other boy, and, startled, he immediately left the room.

103.   Carleton often came into the boys' dorms at night, drunk, sometimes with a martini or other drink in his hand.

104.   On several occasions, Carleton showed Matthew and other boys the violent pornographic movie Caligula.

105.   On approximately 25 occasions during Matthew's three years at Indian Mountain School, Carleton's wife, Kitty, while drinking and drunk, invited Matthew and other boys into her bed in the headmaster's house.  Carleton knew or should have known of his wife's behavior.

106.    Prior to the time that Carleton sexually gratified himself by leering at and touching Matthew, many members of the Indian Mountain School community – including chairman of the Board of Trustees Paul Levin, Assistant Headmaster Steven Carver, teacher Gerard Jones, and other teachers at the school – knew about and witnessed Carleton's perverse fascination with boys' bodies.

107.    Carleton spoke frankly with Carver, Jones and other teachers about watching students take showers.

108.    At faculty meetings, Carleton spoke about the size of boys' penises.

109.    At parties with the trustees, Carleton gave progress reports on the development of boys' bodies.

110.    Carleton frequently visited the boys' showers to leer at the boys' naked bodies, and he frequently visited boys in their dorm rooms late at night, sitting on their beds, and touching them in inappropriate and sexual ways.

111.    Chairman of the Board of Trustees Levin was later quoted as saying: "Boys would come in when they were nine, and they would go through puberty.  He [Carleton] was very interested in that change.  He'd say this boy's got pubic hair and that boy's hairless.  He was very interested in what the boys and girls might be doing with each other sexually.  It was very bizarre for a headmaster to talk that way.  It was a very weird thing to talk about at a party.  Carleton was very definitely kinky.  We used to kind of wince and think he was trying to be funny.  There's a certain kind of person who gets away with murder through charm."

20

112.    After witnessing Carleton ask a boy about his relationship with a girl, teacher Gerard Jones later said, "He [Carleton] made a comment that the boy's penis frightened the girl off."

113.    Notwithstanding their actual knowledge that the school's Headmaster was sexually and perversely fascinated by boys as young as nine years old, Levin, Carver, Jones and the other teachers and trustees did absolutely nothing to protect the children from Carleton's predatory yearnings.

114.    Sometime after these events, in a November 16, 1987 letter to the then Acting Headmaster, the school's psychiatrist, Dr. Mirabile, wrote that Peter Carleton had "emotional problems" and that "misguided self-interest" was sometimes a "major driving force in his life".

115.    The school's affirmative acts created, and exposed Matthew to, a known high degree of risk of harm.

116.    The school was on actual and constructive notice of the risk and of the gravity of the harm that would result if Matthew were sexually molested, abused, threatened or assaulted by one or more of the pedophiles in the school's employ.

117.    The school was on actual and constructive notice of the sexually aberrant behavior and propensities of Christopher Simonds, Peter Carleton, and Windsor Copeland.

118.    The school knew that no other person or entity would assume, or would be allowed to assume, the responsibility for preventing the pedophiles from molesting Matthew.

119.    In fact, Indian Mountain School officials, trustees, administrators and teachers actually conspired to prevent others from learning about or preventing or remedying the ongoing, rampant, serial molestations being perpetrated by school employees on the boys in the school's care and custody.

120.    The school created a situation that it knew and should have known was likely to be dangerous to Matthew and to the other young children in its care.

121.    Despite having created the dangerous situation, the school failed and refused to take appropriate precautions against the risk of harm.

122.    Not only did the school fail and refuse to protect Matthew and the other school children from the sexual predators in their midst, it expected the boys to protect themselves, it blamed them when they failed to do so, and it accused the boys of inviting and actually instigating the sexual abuse.

123.    In response to a lawsuit alleging sexual abuse and assaults similar to those described here, Indian Mountain School blamed the child victim, arguing that: "Any injuries, losses and damages claimed by the plaintiff . . .  were caused by the plaintiff's own negligence. . . ."

124.   As a result of Indian Mountain School's acts and omissions, Matthew's ability to engage in normal life activities has been permanently impaired and he has been and will be unable to lead and enjoy a normal life.

125.   The harm inflicted on Matthew at Indian Mountain School has severely interfered with his ability to enter into lasting meaningful relationships.

126.   Matthew's ability to maintain intimate physical, sexual and emotional relationships has been irreparably damaged.

127.   Matthew has sustained physical pain and suffering.

128.   Matthew has sustained, and will continue over the course of his lifetime to suffer, mental, psychiatric, and emotional injuries, some or all of which are permanent, including severe emotional distress, humiliation, embarrassment, pain and anguish, anxiety, panic, sexual dysfunction, PTSD, depression, hyper-vigilance, shame, and low self-esteem.

129.   Since his time at Indian Mountain School and to this day, Matthew fears that Simonds' pornographic photographs of him have been or will be published on kiddie porn sites on the internet and distributed to pedophiles throughout the world.

130.   If the school and its administrators, faculty, staff, and Board had acted responsibly to report and discipline Simonds in the Spring of 1985 when the school finally decided to terminate Simonds' employment, or earlier when his abuse was known or suspected, the photographs Simonds had taken of Matthew would more likely than not have been confiscated by the school or by law enforcement, they would

have been destroyed, and they would not have remained in Simonds' possession for him to use, distribute and publicize for the rest of his life.

131.   The school's reckless and irresponsible misconduct even after Matthew left the school in 1983 thus caused and continues to cause him harm.

132.   Matthew has also suffered permanent damage to his educational and career prospects and to his past, present and future earnings.

133.   Matthew has also suffered out-of-pocket economic damages in connection with over twenty years of mental health therapy.

134.   Matthew's injuries and damages were caused by the negligence of Indian Mountain School, its teachers, administrators, employees and agents, for whose negligence the school is liable, in the ways previously described and in the following ways:

   a.   The school employed known pedophiles, and allowed those pedophiles free reign to gratify their perverse sexual desires by molesting young vulnerable boys in the school's care and custody;

   b.   The school failed and refused to supervise, discipline, report or fire school administrators and teachers whom it knew and should have known were serial child molesters; and

   c.   The school failed to warn Matthew and his parents of the risk of harm and of the actual harm to which he was subjected while attending Indian Mountain School.

135.    Indian Mountain School owed Matthew a duty of care, it breached that duty, its breach caused Matthew to be repeatedly sexually assaulted, abused and molested, and Matthew suffered damages as a result.

## IV.     Second Claim for Relief (Recklessness):

1.      Paragraphs 1 through135 of the First Claim for Relief are hereby incorporated as Paragraph 1 of this Second Claim for Relief, as if fully set forth herein.

2.      Indian Mountain School, acting through its administrators, teachers and staff, was consciously aware of the fact that it created a substantial risk to Matthew.

3.      Notwithstanding the school's conscious awareness of the risk to Matthew, the school failed to take necessary and appropriate steps to reduce or eliminate the risk.

4.      Notwithstanding the school's conscious awareness of the risk to Matthew, the school took affirmative steps to exacerbate the risk and to make harm and injury to Matthew more likely.

5.      The injuries suffered by Matthew were caused by the reckless or callous indifference, or the wanton misconduct, of the defendant.

## V.      Third Claim for Relief (Negligent Infliction of Emotional Distress):

1.      Paragraphs 1 through 135 of the First Claim for Relief are hereby incorporated as Paragraph 1 of this Third Claim for Relief, as if fully set forth herein.

25

2.      Indian Mountain School created an unreasonable risk of causing Matthew emotional distress.

3.      Matthew suffered distress, and his distress was foreseeable.

4.      The emotional distress was severe enough that it might result in illness or bodily harm.

5.      The school's conduct was the cause of Matthew's distress.

**VI.    Fourth Claim for Relief (Intentional Infliction of Emotional Distress):**

1.      Paragraphs 1 through 135 of the First Claim for Relief are hereby incorporated as Paragraph 1 of this Fourth Claim for Relief, as if fully set forth herein.

2.      Indian Mountain School intended to inflict emotional distress or it knew or should have known that emotional distress was the likely result of its conduct.

3.      The school's conduct was extreme and outrageous.

4.      The school's conduct was the cause of Matthew's distress.

5.      The emotional distress sustained by Matthew was severe.

**VII.   Fifth Claim for Relief (Breach of Fiduciary Duty):**

1.      Paragraphs 1 through 135 of the First Claim for Relief are hereby incorporated as Paragraph 1 of this Fifth Claim for Relief, as if fully set forth herein.

2.      A fiduciary relationship existed between Indian Mountain School and Matthew which gave rise to (a) a duty of loyalty on the part of the defendant to the

plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any manner relating to the plaintiff.

3.      The school advanced its own interests to the detriment of the plaintiff.

4.      Matthew sustained damages.

5.      Matthew's damages were proximately caused by the school's breach of its fiduciary duty.

VIII.   **PRAYER FOR RELIEF**

Wherefore, the plaintiff prays for the following relief:

1.  Compensatory damages;

2.  Punitive damages; and

3.  Such other relief as the Court deems just and proper.

PLAINTIFF MATTHEW BERNSTEIN

BY s/Antonio Ponvert III
ANTONIO PONVERT III ct17516
CHRISTOPHER MATTEI ct27500
KOSKOFF, KOSKOFF & BIEDER, P.C.
350 FAIRFIELD AVENUE
BRIDGEPORT, CT 06604
Tel: 203-336-4421
(203)368-3244 (facsimile)
aponvert@koskoff.com

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MATTHEW BERNSTEIN | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | |
| | | |
| V. | : | |
| | : | |
| INDIAN MOUNTAIN SCHOOL, INC., | : | |
| | : | |
| Defendant. | : | JULY 28, 2016 |

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. Rule 38, the plaintiff in the above-captioned matter hereby demands a trial by jury on all issues.

THE PLAINTIFF

By /s/ Antonio Ponvert III
Antonio Ponvert III
Federal Bar No. ct 17516
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, Connecticut 06604
TEL:  203-336-4421
FAX: 203-368-3244
Email: aponvert@koskoff.com